# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JEONG SEON HAN, | ) |  |
|  | ) |  |
| Petitioner, | ) |  |
|  | ) |  |
| v. | ) | No. 16–cv–0601 (KBJ) |
|  | ) |  |
| LORETTA E. LYNCH, *Attorney* | ) |  |
| *General of the United States, et al.*, | ) |  |
|  | ) |  |
| Respondents. | ) |  |
|  | ) |  |

## MEMORANDUM OPINION

Petitioner Jeong Seon Han is a Korean national who, until recently, was actively employed as an engineer aboard a U.S.-flagged commercial fishing vessel. Han has filed a petition for habeas corpus in this Court in which he complains that he has been "effectively detained by the United States pending a U.S. Coast Guard investigation into purported violations" of federal and international environmental law. (Pet. for Habeas Corpus ("Pet."), ECF No. 1, at 1; *see also* Decl. of Jeong Seon Han ("Han Decl."), Attach. A to Pet., ECF No. 1-1, at 2.)[1] Han contends that he has been stripped of his liberty as a condition of an agreement that the United States and the vessel owner executed (hereinafter referred to as the "Security Agreement"), which required the vessel owner to "request" that certain crew members, including Han, surrender their passports and remain within the jurisdiction of the District of Columbia pending further investigation into suspected violations of law. (*See* Pet. at 1; Agreement on Security

---

[1] Page-number citations to documents the parties have filed refer to the page numbers that the Court's electronic filing system assigns.

("Sec. Agreement"), Ex. 4 to Pet., ECF No. 1-5, at 9.)  Han's habeas petition implores this Court to order Respondents U.S. Attorney General Loretta Lynch and Paul Zukunft (the Commandant of the U.S. Coast Guard) to release Han from his "constructive" detention in the District of Columbia (Pet. at 3), and to "[o]rder [Han] . . . free to return to his home in Korea" (*id.* at 12).  However, at present, Han is no longer detained in the District of Columbia.  Han's status has changed because, shortly after Han filed the instant habeas petition, the U.S. government initiated serial criminal proceedings against him—first in the District of Columbia, and thereafter in the District of Hawaii. Han is now located in Hawaii, where a district court order restricts his freedom of movement to the island of Oahu.

Before this Court at present is the Respondents' Motion to Dismiss Han's habeas petition, which was filed following the initiation of the criminal proceedings, and which presents a suggestion of mootness.  (*See* Defs.' Mot. to Dismiss ("Resp'ts' Mot."), ECF No. 9, at 11–12.)  For the reasons explained below, this Court concludes that Han's habeas petition is now moot with respect to his pre-indictment detention in the District of Columbia, and to the extent that Han's petition can be construed to seek relief from his current detention in Hawaii, this Court lacks jurisdiction over Han's claim, as district courts may only grant writs of habeas corpus "within their respective jurisdictions."  28 U.S.C. § 2241(a).  Accordingly, the Respondents' Motion to Dismiss the instant habeas petition will be **GRANTED**.

A separate order consistent with this Memorandum Opinion shall follow.

# I.   BACKGROUND

## A.   Facts

On June 30, 2015, the *Pacific Breeze*, a U.S.-flagged purse seine fishing vessel, arrived in Pago Pago, American Samoa to unload its catch before undergoing routine maintenance.  (*See* Pet. at 5.)[2]  Petitioner Han had been working aboard the *Pacific Breeze* as an engineer.  (*See id.*)  On July 7, 2015, United States Coast Guard personnel boarded the *Pacific Breeze* while the vessel was docked in Pago Pago in order to conduct a scheduled, annual inspection "to determine if any illegal discharges of machinery space bilge water or other oily waste had occurred, in violation of the MARPOL Protocol, an international treaty implemented in the United States by the Act to Prevent Pollution from Ships ('APPS')."  (Resp'ts' Mot. at 4.)[3]  During the course of this inspection, which lasted "several days and eventually involved criminal investigators from the Coast Guard Investigative Service," Han was not permitted to leave the vessel.  (Pet. at 5–6.)

The Coast Guard's inspection revealed several "deficiencies" and other "conditions . . . believed to be indicative of criminal violation[s] of [the] APPS[.]"

---

[2] A purse seine vessel is a particular type of commercial fishing boat.  It "employ[s] a purse seine net, which is a specific kind of fishing net that is described as a floated and weighted encircling net that is closed by means of a drawstring threaded through rings attached to the bottom[.]  Purse seine nets are over half a mile long[.]"  *Pacific Ranger, LLC v. Pritzker*, No. 15-cv-509, 2016 WL 5676276, at *4 (D.D.C. Sept. 30, 2016) (second alteration in original) (internal quotation marks and citation omitted).

[3] "The United States is part of an international regime called the International Convention for the Prevention of Pollution from Ships," *United States v. Han*, No. 16-cr-71, 2016 WL 4132203, at *1 (D.D.C. Aug. 3, 2016), which "is commonly known as 'MARPOL' or the 'MARPOL Protocol[,]'" *Watervale Marine Co. v. U.S. Dep't of Homeland Sec.* ("*Watervale I*"), 55 F. Supp. 3d 124, 128 (D.D.C. 2014).  "Among other things, MARPOL prohibits vessels from discharging oily wastewater into the sea unless it is first processed through filtration equipment, and requires that such discharges be recorded in an oil record book that is available for inspection upon entry into port."  *Han*, 2016 WL 4132203, at *1.  The APPS, which was enacted to implement MARPOL, "makes it a crime for any person to knowingly violate MARPOL[.]"  *Id.*

(Resp'ts' Mot. at 5.)  As a result of these findings, the Coast Guard detained the *Pacific Breeze* for further investigation.  (*See* Pet. at 6.)  The *Pacific Breeze* was finally released on September 3, 2015, after the owner of the vessel—Pacific Breeze Fisheries, LLC—executed a Security Agreement that the Coast Guard drafted.  (*See id.* at 7; Pet'r's Opp'n to Resp'ts' Mot. ("Pet'r's Opp'n"), ECF No. 10, at 6.)  Under the terms of this Security Agreement, the *Pacific Breeze* was permitted to depart American Samoa in exchange for the vessel owner's promise to ensure that certain crew members, including Han, "remained within [] the jurisdiction of the U.S. District Court of the District of Columbia" (Pet. at 8 (alteration in original) (internal quotation marks and citation omitted); *see also id.* at 7) "during the pendency of the investigation and any possible resulting trial" (Resp'ts' Mot. at 5).[4]

In accordance with the Security Agreement, Pacific Breeze Fisheries, LLC transported Han and certain other crew members to Virginia on October 25, 2015.  (*See* Pet. at 8.)  Thereafter, "[f]or nearly nine months," Han was "housed in an apartment in McLean, Virginia, awaiting a determination by the U.S. Department of Justice

---

[4] This form of quid pro quo—namely, the execution of a security agreement in exchange for the release of a detained vessel—is a common practice in the context of suspected APPS violations.  *See, e.g.*, *Watervale Marine Co. v. U.S. Dep't of Homeland Sec.* ("*Watervale II*"), 807 F.3d 325, 328 (D.C. Cir. 2015) ("[T]he vessels were eventually released, but not until appellants had both posted a bond *and* executed a 'Security Agreement.'" (emphasis in original)); *In re Mercator Lines Ltd.*, Misc. No. 11-00024, 2011 WL 10637454, at *2 (S.D. Ala. Oct. 25, 2011) ("Pursuant to the terms of this [Agreement on Security], the Coast Guard released the vessel in exchange for the posting of $500,0000.00 surety bonds[.]").  Such agreements, which frequently require vessel owners to ensure that certain crew members remain within a specified jurisdiction, *see Watervale I*, 55 F. Supp. 3d at 131, are designed to permit the government to further investigate potential violations of the law and then "later prosecute its case if merited[,]" *Watervale II*, 807 F.3d at 328; *see also id.* at 331 ("Accordingly, we must assume that holding the ships and crew until a civil or criminal proceeding was completed was reasonable."); *Watervale I*, 55 F. Supp. 3d at 148 ("[T]he Coast Guard's argument here is that the challenged security agreements are 'essential' to its investigation and prosecution of suspected MARPOL violations[.]"); *Giuseppe Bottiglieri Shipping Co. v. United States*, 843 F. Supp. 2d 1241, 1244 (S.D. Ala. 2012) (acknowledging security agreement "provisions for the eight crew members whose presence in Mobile [Alabama] the Coast Guard requires as its APPS investigation proceeds").

regarding whether it would pursue any criminal actions." (*Id.*) Han filed a petition for habeas corpus with this Court on April 1, 2016, alleging that he was being effectively detained within the District of Columbia "without any process for nearly nine months" pending a Coast Guard investigation into purported violations of the APPS. (*Id.* at 4; *see also id.* at 1, 2.)

Han's troubles did not end there. Just four days after Han submitted his habeas petition, the U.S. government filed a criminal complaint against Han in the U.S. District Court for the District of Columbia, charging him with violating the APPS (*see* Resp'ts' Mot. at 7; Decl. of Candi Meyers ("Meyers Decl."), Attach. to Resp'ts' Mot., ECF No. 9-1, at 8), and on April 26, 2016, a federal grand jury indicted Han of three APPS violations (*see* Resp'ts' Mot. at 7). The district judge presiding over Han's criminal matter ultimately dismissed the April 26th indictment without prejudice for improper venue, but held its order in abeyance for ten days in order to give the government time to file the appropriate charging documents in the District of Hawaii, where the court concluded that venue was proper. *See United States v. Han*, No. 16-cr-71, 2016 WL 4132203, at *13 (D.D.C. Aug. 3, 2016) (Chutkan, J.).

Then, on August 10, 2016, the government indicted Han of the same charges in the District of Hawaii. (*See* Resp'ts' Suppl. Mem. in Supp. of Resp'ts' Mot. ("Resp'ts' Suppl. Mem."), ECF No. 14, at 1; Pet'r's Resp. to Ct.'s Min. Order ("Pet'r's Suppl. Mem."), ECF No. 13, at 2; District of Hawaii Criminal Docket for case No. 16-cr-512 ("Hawaii Criminal Docket"), Ex. 1 to Pet'r's Suppl. Mem., ECF No. 13-1, at 3.) Following the return of the indictment in Hawaii, counsel for both parties coordinated Han's transport from the District of Columbia to Hawaii. (*See* Resp'ts' Reply to Pet'r's

Suppl. Mem. ("Resp'ts' Suppl. Reply"), ECF No. 16, at 3; Oct. 5, 2016 Letter from

Kenneth Nelson ("Nelson Letter"), Ex. A to Resp'ts' Suppl. Reply, ECF No. 16-1, at 1;

Email exchange between Kenneth Nelson and Stephen Darmody ("Transport emails"),

Ex. 2 to Pet'r's Suppl. Mem., ECF No. 13-2, at 2–4.)[5]  On August 24, 2016, the District

Court for the District of Hawaii issued an order imposing certain conditions of release

on Han, including conditions that required Han to surrender his passport and remain on

the island of Oahu.  (*See* Hawaii Conditions of Release, Ex. 2 to Resp'ts' Suppl. Mem.,

ECF No. 14-2, at 1–2.)

Thus, notwithstanding the fact that Han originally sought relief for his ongoing

detention in the District of Columbia "pending a U.S. Coast Guard investigation into

purported violations of the [APPS]" (Pet. at 1), Han is presently located in the District

of Hawaii, where he faces criminal charges for violating the APPS, and where a court

order restricts his freedom of movement.  Consequently, Han has effectively

experienced not one, but *two*, distinct detentions: (1) Han's pre-indictment detention in

the District of Columbia pursuant to the Security Agreement, and (2) Han's current

detention in Hawaii based on an indictment and a court order imposing conditions of

release.

**B.     Respondents' Motion to Dismiss**

The pending Motion to Dismiss Han's habeas petition, which Respondents filed

in this Court on May 20, 2016 (after Han's initial indictment but prior to his indictment

---

[5] In order to avoid having Han transported to Hawaii in the custody of the U.S. Marshals, counsel for
both sides arranged a non-custodial method of transportation.  (*See* Nelson Letter at 1; Transport emails
at 2–4.)  Specifically, "the Security Agreement was used . . . as a mechanism to have [Han's] employer
pay for his flight."  (Resp'ts' Suppl. Reply at 3.)

in, and transport to, Hawaii), primarily addresses the pre-indictment period of detention.  Respondents argue that it was Han's employer who required him to remain in the District of Columbia pursuant to the Security Agreement, and thus, that "Han has not been detained by the United States, effectively or otherwise."  (Resp'ts' Mot. at 3.) Respondents further maintain that, in any event, Han is not being held in violation of his Fifth Amendment rights because a federal grand jury has returned an indictment against him.  (*See id.*; *see also id.* at 10–11 (characterizing Han's lack of illegal detention by the United States as a problem of standing and mootness).)  In response, Han argues that he is "in custody *under or by color of the authority* of the United States" because the government directed and enforced his detention.  (Pet'r's Opp'n at 15 (emphasis in original).)  Han also emphasizes that, because his detention continues notwithstanding the subsequent indictment, his petition is not moot, and in the alternative, he insists that his case falls within the capable of repetition yet evading review exception to mootness.  (*See id.* at 15–20.)

On September 9, 2016, after Han was moved to Hawaii, this Court ordered the parties to submit supplemental briefs addressing the extent to which Han's relocation impacted the instant matter.  (*See* Min. Order of Sept. 9, 2016.)  In its response, the government again questioned this Court's jurisdiction on mootness grounds, and suggested that the Court transfer Han's case to the District of Hawaii pursuant to 28 U.S.C. § 1404(a) in the event it concludes that the case is not moot.  (*See* Resp'ts' Suppl. Mem. at 1–5; Resp'ts' Suppl. Reply at 1, 4.)  In response, Han reiterated that his case was not moot and that, in any event, his claim fell within the exception to mootness for actions capable of repetition yet evading review.  (*See* Pet'r's Suppl.

Mem. at 2–3; Pet'r's Resp. to Resp'ts' Suppl. Mem. ("Pet'r's Suppl. Reply"), ECF No. 15, at 3–4.)

Respondents' motion to dismiss Han's habeas petition is now ripe for this Court's review.  (*See generally* Resp'ts' Mot.; Pet'r's Opp'n; Resp'ts' Reply to Pet'r's Opp'n ("Resp'ts' Reply"), ECF No. 11.)

## II.    LEGAL STANDARD

The doctrines of standing, mootness, and ripeness are "[t]hree inter-related" doctrines of justiciability that determine the "constitutional boundaries" of a court's jurisdiction.  *See Worth v. Jackson*, 451 F.3d 854, 855, 857 (D.C. Cir. 2006); *see also Safari Club Int'l v. Jewell*, No. 15-5170, slip op. at 5 (D.C. Cir. Dec. 6, 2016) ("To determine whether we and the district court have Article III jurisdiction, we must decide whether [Plaintiff] has standing and whether its claims are moot."); *Mine Reclamation Corp. v. FERC*, 30 F.3d 1519, 1522 (D.C. Cir. 1994) ("[M]ootness goes to the jurisdiction of this court.").  Consequently, although "there is a significant difference between determining whether a federal court has 'jurisdiction of the subject matter' and determining whether a cause over which a court has subject matter jurisdiction is 'justiciable[,]'" *Powell v. McCormack*, 395 U.S. 486, 512 (1969), "[a] motion to dismiss for mootness is properly brought under Federal Rule of Civil Procedure 12(b)(1)." *Friends of Animals v. Salazar*, 670 F. Supp. 2d 7, 11 (D.D.C. 2009); *see also Abu Ali v. Gonzales*, 387 F. Supp. 2d 16, 17 (D.D.C. 2005) (explaining that Rule 12(b)(1) imposes on the court an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority, which includes the obligation to consider the possibility of mootness" (internal quotation marks and citations omitted));

*see, e.g.*, *Fraternal Order of Police, D.C. v. Rubin*, 134 F. Supp. 2d 39, 44 (D.D.C. 2001) (granting 12(b)(1) motion to dismiss on mootness grounds).

When ruling on a Rule 12(b)(1) motion, the court must "treat the complaint's factual allegations as true" and afford the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Delta Air Lines, Inc. v. Export–Import Bank of U.S.*, 85 F. Supp. 3d 250, 259 (D.D.C. 2015) (internal quotation marks and citation omitted). However, those factual allegations receive "closer scrutiny" than they would in the Rule 12(b)(6) context. *Id.* (internal quotation marks and citation omitted). Moreover, unlike a Rule 12(b)(6) motion, a court may look to documents outside of the complaint in order to evaluate whether or not it has jurisdiction to entertain a claim. *See Jerome Stevens Pharm., Inc. v. FDA,* 402 F.3d 1249, 1253 (D.C. Cir. 2005).

A plaintiff always bears the ultimate burden of showing, by a preponderance of the evidence, that the court has jurisdiction over his claims, *see Delta Air Lines*, 85 F. Supp. 3d at 259; *Muhammad v. FDIC*, 751 F. Supp. 2d 114, 118 (D.D.C. 2010); however, where mootness is at issue, "[t]he initial 'heavy burden' of establishing mootness lies with the party asserting a case is moot, but the opposing party bears the burden of showing an exception applies[.]" *Honeywell Int'l v. Nuclear Regulatory Comm'n*, 628 F3d 568, 576 (D.C. Cir. 2010) (citations omitted). If the court determines that a claim is moot because it no longer presents a live controversy, the court lacks jurisdiction to entertain the claim, and must dismiss it. *See* Fed. R. Civ. P. 12(b)(1), 12(h)(3). In other words, "mootness, however it may have come about, simply deprives [the court] of [its] power to act[.]" *Spencer v. Kemna*, 523 U.S. 1, 18 (1998).

## III.   ANALYSIS

In the instant case, there is no dispute that Han is no longer being detained in the location he originally complained of (the District of Columbia) by virtue of the mechanism he originally complained of (the Security Agreement).  Instead, Han is currently being held in Hawaii due to a criminal indictment and a court order that imposes various conditions of release.  Thus, even assuming, *arguendo*, that Han has met all of the substantive requirements necessary to obtain habeas relief with respect to either (1) his pre-indictment detention in the District of Columbia pursuant to the Security Agreement, or (2) his current detention in Hawaii, this Court lacks jurisdiction over Han's habeas claims, as explained below.[6]

### A.   Han's Habeas Claim Regarding His Pre-Indictment Detention Is Moot Because That Detention Has Ended, And The Capable Of Repetition Yet Evading Review Exception To Mootness Does Not Apply

"The mootness doctrine, deriving from Article III, limits federal courts to deciding actual, ongoing controversies." *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 645 (D.C. Cir. 2011); *see also Abu Ali*, 387 F. Supp. 2d at 18 ("Mootness is not merely a reflection of practical considerations, it is a constitutional imperative, derived from the enumerated powers that Article III bestows upon the federal judiciary.").  A case

---

[6] Given the text of the applicable habeas statutes, it is not entirely clear that Han has even raised a cognizable habeas claim with respect to either detention period. *See* 28 U.S.C. § 2241(c) ("The writ of habeas corpus shall not extend to a prisoner unless—(1) He is in custody under or by color of the authority of the United States . . . or . . . (3) He is in custody in violation of the Constitution or laws or treaties of the United States[.]"); *id.* § 2242 ("Application for a writ of habeas corpus shall . . . allege the facts concerning the applicant's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority, if known."). However, this Court must address its own jurisdiction prior to evaluating this claim on the merits. *Cf. Safari Club Int'l v. Jewell*, No. 15-5170, slip op. at 5 (D.C. Cir. Dec. 6, 2016) ("The parties devote the bulk of their briefing to finality and exhaustion, but this puts the cart before the horse, for we must begin with our jurisdiction.").  And for the reasons explained below, this Court concludes that it lacks jurisdiction over Han's habeas claims because, first, Han's pre-indictment detention has ended and no longer presents a live controversy, and second, Han's current detention in Hawaii exceeds the bounds of this Court's territorial jurisdiction.

becomes moot either "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Cty. of Los Angeles v. Davis,* 440 U.S. 625, 631 (1979) (internal quotation marks and citation omitted).  Put another way, "[e]ven where a case once posed a live controversy when filed, the [mootness] doctrine requires the Court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *True the Vote, Inc. v. IRS*, 831 F.3d 551, 558 (D.C. Cir. 2016) (alterations in original) (internal quotation marks and citations omitted); *see also* 13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3533 (3d ed. 2008) ("The central question . . . is constant—whether decision of a once living dispute continues to be justified by a sufficient prospect that the decision will have an impact on the parties.").

One frequently raised (but narrow) exception to mootness occurs in a circumstance in which the challenged action is one that is "capable of repetition, yet evading review[.]" *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 632 (D.C. Cir. 2002).  However, as explained below, the instant case presents no such circumstance.  Even assuming that Han's pre-indictment detention may have posed a live controversy at the time when Han filed his habeas petition, subsequent developments have ensured that a court decision regarding that pre-indictment detention period will "neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *True the Vote*, 831 F.3d at 558 (internal quotation marks and citations omitted).  Thus, Han's habeas claims with respect to the pre-indictment period of detention are moot.

1.  <u>Han's Pre-Indictment Detention No Longer Presents A Live Issue</u>

Han's habeas petition alleges that he "has been effectively detained by the United States pending a U.S. Coast Guard investigation into purported violations of the [APPS]."  (Pet. at 1.)  As relevant here, the language of section 2241 of Title 28 of the U.S. Code establishes that a valid habeas petition must make a plausible claim that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States[,]" or "is in custody under or by color of the authority of the United States[.]" 28 U.S.C. §§ 2241(c)(1), (c)(3); s*ee also Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) ("[L]ongstanding practice confirms that in habeas challenges to present physical confinement—'core challenges'—the default rule is that the proper respondent is the warden of the facility where the prisoner is being held." (citations omitted)).  Moreover, it is clear beyond cavil that a habeas petition becomes moot when the detention that the petitioner is challenging is over.  *See United States ex rel. Lynn v. Downer*, 322 U.S. 756, 756 (1944) ("Petition for writ of certiorari to the Circuit Court of Appeals for the Second Circuit denied on the grounds that the case is moot, it appearing that petitioner no longer is in respondent's custody." (citations omitted)); *Rimi v. Obama*, 60 F. Supp. 3d 52, 58 (D.D.C. 2014) ("[Petitioner] is neither in custody nor able to demonstrate any cognizable collateral consequence of his prior detention at Guantánamo, and therefore his habeas claim remains moot.").

This Court finds that any habeas claim that arises out of Han's detention in the District of Columbia under the terms of the challenged Security Agreement no longer presents a live controversy that this Court has the power to review, because the pre-indictment period of detention that is the target of his pending habeas petition has

unquestionably come to an end notwithstanding the fact that Han has not yet been released to return to Korea.  In other words, it is clear to this Court that Han is no longer compelled to remain "within the jurisdiction of the U.S. District Court of the District of Columbia" *by virtue of the Security Agreement* (Sec. Agreement at 6); instead, he is presently restricted to the island of Oahu pursuant to a criminal indictment and an order from the District Court for the District of Hawaii (*see* Hawaii Conditions of Release at 1–3).

To understand why Han's period of pre-indictment detention pursuant to the Security Agreement is over, consider the well-established function of security agreements in the suspected APPS-violation context.  As noted above, the Coast Guard regularly enters into standard security agreements with vessel owners in order to facilitate the U.S. government's investigation into suspected APPS violations.  *See Watervale I*, 55 F. Supp. 3d at 148–49; *see also supra* n.4.  At the conclusion of the Coast Guard's APPS investigation, the agency either files criminal charges, or it does not.  *See Watervale II*, 807 F.3d at 328; *see also Angelex Ltd v. United States*, 723 F.3d 500, 503–04 (4th Cir. 2013); *United States v. Abrogar*, 459 F.3d 430, 433 (3d Cir. 2006).  Consequently, with respect to the person who is the target of the APPS inquiry, the security agreement is designed to provide for the detention of individuals *up until* the point that a criminal indictment is filed; once the grand jury returns an indictment, it is the adversarial criminal process (rather than any pre-indictment agreement between the vessel owner and the government) that provides the means to effectuate any further detention.

Thus, in this Court's view, Han's period of detention pursuant to the Security

Agreement ended the moment that the U.S. government indicted him.  And Han has not pointed to any provision in the challenged Security Agreement that requires his restraint after the criminal proceedings have concluded; he only makes the bald contention that "if the indictment is dismissed, . . . the Security Agreement will still be in place and Mr[.] Han's liberty will still be in the hands of ICE [and] the Coast Guard[.]"  (Pet'r's Opp'n at 17 (internal citation omitted).)  This means that a Court order addressing the validity of Han's pre-indictment detention pursuant to the challenged Security Agreement would have no bearing on Han's present rights.  *See True the Vote*, 831 F.3d at 558.  And, therefore, Han's habeas petition presents no more of a live controversy than a habeas petition filed by someone who has already been unconditionally released. *See Qassim v. Bush*, 466 F.3d 1073, 1074–76, 1078 (D.C. Cir. 2006) (granting motion to dismiss where former Guantánamo Bay detainees had been released to Albania, rendering appeal moot); *De Long v. Hennessey*, 912 F.2d 1144, 1146 (9th Cir. 1990) (district court properly denied habeas petition where petitioner had been released from custody and was not under court supervision).

2.   <u>The Capable Of Repetition Yet Evading Review Exception To Mootness Does Not Apply Because There Is No Reasonable Expectation That Han Will Again Be Subjected To The Same Harm</u>

In an effort to avoid this mootness conclusion, Han maintains that his circumstances fit into the narrow exception to mootness for actions that are capable of repetition yet evading review.  (*See* Pet'r's Opp'n at 18 ("[T]he Coast Guard's practice of ensuring the indefinite detention of sailors pursuant to security agreements evades review because unless it is stopped, the government will again . . . recharacterize the terms of the detention from one imposed by the Security Agreement to one imposed by

court order with the goal of avoiding judicial review of its actions altogether.").)  As explained below, this Court disagrees, because it finds that Han's pre-indictment detention does not satisfy the capable-of-repetition requirement for this exception.

"[T]he capable-of-repetition doctrine applies only in exceptional situations, where the following two circumstances [are] simultaneously present: (1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again."  *Spencer*, 523 U.S. at 17 (alterations in original) (internal quotation marks and citations omitted).[7]  "Under the capable of repetition prong, there must be [1] a 'reasonable expectation [2] that the *same complaining party* would [3] be subjected to the *same action* again.'"  *Pharmachemie*, 276 F.3d at 633 (emphases in original) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).  And the "same action" requirement "generally refer[s] to particular agency policies, regulations, guidelines, or recurrent identical agency actions."  *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 324 (D.C. Cir. 2014) (alteration in original) (internal quotation marks and citation omitted).

Notably, when a court determines whether the same action will recur, the critical inquiry is not "whether the precise historical facts that spawned the plaintiff's claims are likely to recur," but rather "whether the *legal wrong* complained of by the plaintiff is reasonably likely to recur."  *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009) (emphasis added).  Thus, as a general matter, the capable of

---

[7] As the name of the exception suggests, the first requirement is commonly referred to as the "evades review" requirement, while the second is often termed the "capable of repetition" requirement.  *See Pharmachemie*, 276 F.3d at 633.

repetition prong involves a determination of whether there is a "reasonable expectation" that the "same party" will again be subjected to the challenged legal wrong, which is an inquiry that requires the court to assess the degree of probability of recurrence. *See* 13C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3533.8.1 (3d ed. 2008). Importantly, "[t]here is no set probability number that separates a sufficient prospect of repetition from an insufficient prospect[,]" *id.*; "[i]t is enough . . . that the litigant faces *some* likelihood of becoming involved in the same controversy in the future." *Doe v. Sullivan*, 938 F.2d 1370, 1379 (D.C. Cir. 1991) (internal quotation marks and citations omitted)); *see also Ralls*, 758 F.3d at 324 ("In other words, a controversy need only be *capable* of repetition, not more probable than not." (emphasis in original) (emphasis added; internal quotation marks and citation omitted)). But, "a speculative possibility is not a basis for retaining jurisdiction over a moot case." *In re Operation of the Mo. River Sys. Litig.*, 421 F.3d 618, 631–32 (8th Cir. 2005) (internal quotation marks and citation omitted); *see also Columbian Rope Co. v. West*, 142 F.3d 1313, 1317 (D.C. Cir. 1998) (rejecting exception to mootness where possibility of recurrence was "too speculative").

Here, Han objects to "the Coast Guard's practice of trading the release of ships for the liberty of sailors" (Pet'r's Opp'n at 19), and "of detaining sailors indefinitely" pending further investigation into suspected violations of law (*id.* at 16), pursuant to security agreements that are executed with vessel owners. But even if "the Coast Guard's practice of trading the release of ships for the liberty of sailors is an established and enduring one" (*id.* at 19), and therefore reasonably capable of recurrence writ large, Han has not established a reasonable expectation that *he* will

again be unlawfully detained by virtue of such an agreement.  Han generally maintains

that serving as a sailor "is his livelihood and trade[,]" and that once he is released and

returned to sea "he would [again] be subject to the same kind of security agreement—

and the indefinite detention devoid of due process that it engenders[.]" (*Id.* at 20.)  But

he fails to acknowledge that the security agreements he seeks to challenge arise from

the U.S. government's suspicion of criminal wrongdoing, and he does not explain why

there is "some likelihood" that the Coast Guard will once again suspect the ship he is

working on of violations of the APPS, and that the agency will consider *him* to be a

target or material witness with respect to that suspected violation, such that *he* will

again be subjected to the Coast Guard's allegedly unlawful detention practices.

*Sullivan*, 938 F.2d at 1379.

    To be sure, there is some tension in the D.C. Circuit's pronouncements regarding

the capable-of-repetition doctrine, and in particular, the likelihood of recurrence as to

the same complaining party.  *Compare Ralls*, 758 F.3d at 325 ("[T]here is some

likelihood that [Plaintiff] will again acquire easements to project sites near security-

sensitive Government property and/or airspace given [Plaintiff's] intention to continue

its practice of pursuing windfarm projects throughout the United States[,]" and "there is

some likelihood that [the committee] will again respond similarly in the future"

(internal quotation marks and citation omitted)), *with Columbian Rope*, 142 F.3d at 317

("There is no reasonable expectation that [Plaintiff] will" again be forced to compete

against an ineligible rival bidder for "contacts based on the same military specification"

because the possibility that "the government will again seek to purchase more rope

assemblies for helicopter airlift operations under the same specifications" is "too

speculative"). However, in this Court's view, the purportedly criminal character of Han's conduct distinguishes this case from any prior pronouncement by the D.C. Circuit suggesting that a plaintiff may satisfy the capable of repetition exception by alleging an intention to act similarly in the future. *See, e.g.*, *Ralls*, 758 F.3d at 324−25. In the instant case, there is an added layer of uncertainty because, even accepting Han's contention that he plans to resume work as a sailor upon his release from the Hawaii court order as true (*see* Pet'r's Opp'n at 20), this Court is "'unwilling to assume that [Han] will repeat the type of misconduct that would once again place him . . . at risk of'" another detention pending investigation into APPS violations. *McBryde v. Comm. to Review Circuit Council Conduct*, 264 F.3d 52, 56 (D.C. Cir. 2001) (quoting *Honig v. Doe*, 484 U.S. 305, 320 (1988)); *see also Los Angeles v. Lyons*, 461 U.S. 95, 105−106, 108 (1983) (finding no threat that party seeking injunction barring police use of chokeholds would be stopped again for traffic violation or other offense, or would resist arrest if stopped); *Murphy v. Hunt*, 455 U.S. 478, 484 (1982) (finding no reason to believe that party challenging denial of pre-trial bail "will once again be in a position to demand bail").

What is more, "[i]n estimating the likelihood of an event's occurring in the future, a natural starting point is how often it has occurred in the past." *Sullivan*, 938 F.2d at 1376−77 (internal quotation marks omitted). Despite Han's emphasis on the Coast Guard's broader practice of detaining sailors pursuant to security agreements (*see* Pet'r's Opp'n at 19), there is no evidence that *Han himself* has ever before been detained pursuant to one such agreement. Han acknowledges that he has been "working as the chief engineer onboard commercial vessels since approximately 1989" (Han

Decl. at 2); yet, throughout a career spanning over 25 years, there is no evidence that Han has ever previously been subjected to a comparable detention.  *Cf. Del Monte*, 570 F.3d at 324, 325 (concluding that plaintiff's injury was capable of repetition where plaintiff engaged in "an ongoing commercial enterprise . . . that require[d] one-year licenses" and offered evidence that the licensing agency had failed to conform to mandated procedures "on five separate occasions in the past").

This Court also rejects Han's unsupported contention that his detention pursuant to the Security Agreement is "capable of repetition" because the Respondents "used the security agreement to . . . transport [Han] to Hawaii" after his criminal indictment in the District of Columbia was dismissed for improper venue.  (Pet'r's Suppl. Reply at 2.) The record clearly demonstrates that, after the indictment was returned in Hawaii, "Han *agreed* to fly to Hawaii to respond to the criminal summons issued there[,]" and counsel for both parties conferred regarding the best method of transporting Han to Hawaii. (Resp'ts' Suppl. Reply at 3 (emphasis added); *see also* Nelson Letter at 1; Transport emails at 1–4.)  Because the parties were motivated by a common desire to avoid having Han transported in custody, counsel agreed to rely upon the Security Agreement "as a mechanism to have [Han's] employer pay for his flight."  (Resp'ts' Suppl. Reply at 3; *see also id.* at 2–3 ("[T]he Security Agreement was used . . . as the mechanism to transport him to Hawaii instead of the government issuing a bench warrant for Han and arresting him and then transporting him in custody with U.S. Marshals."); Nelson Letter at 1.)  Thus, it is simply not the case that the Security Agreement was improperly wielded as means of detaining Han during his transport to Hawaii in a manner that supports any inference that "his custody [is] capable of repetition[,]" as Han seeks to

argue here.  (Pet'r's Suppl. Reply at 2.)

Ultimately, the likelihood that Han will be "involved in the same controversy in the future[,]" *see Sullivan*, 938 F.2d at 1379 (internal quotation marks and citation omitted), rests on a series of events, each of which is highly speculative: (1) that Han will be employed on another vessel that Coast Guard investigators detain for suspected violations of law; (2) that during the course of the Coast Guard's investigation, the inspectors will uncover evidence that somehow implicates Han in the suspected violations; and (3) that the Coast Guard will agree with the vessel owners to condition the vessel's release on Han remaining within the United States pending further investigation.  This is not only "too speculative an interest upon which to base Article III jurisdiction[,]" *Columbian Rope*, 142 F.3d at 1317 (citation omitted), it is also at odds with the courts' general "unwilling[ness] to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of injury[,]" *McBryde*, 264 F.3d at 56 (internal quotation marks and citation omitted)).

Therefore, this Court concludes that there is no reasonable expectation that Han will again by subjected to the same harm, which means that this case does not fall within the capable of repetition yet evading review exception to mootness.

### B.    To The Extent That Han Seeks Relief From His Current Detention In Hawaii Pursuant To A Court Order, This Court Lacks Jurisdiction Over Han's Claim

Han's habeas petition does not fare any better if it is construed as a challenge to his current detention on the island of Oahu, rather than a (now moot) challenge to his pre-indictment detention, because this Court cannot issue a writ of habeas corpus to remedy Han's current detention.  A federal court can only issue a writ of habeas corpus

if (1) the petitioner is physically confined within the court's territorial jurisdiction, and (2) the court has personal jurisdiction over the petitioner's immediate custodian. *See Padilla*, 542 U.S. at 444, 447. This means that, as a general matter, courts may grant habeas relief only "within their respective jurisdictions." 28 U.S.C. § 2241(a); *see also Stokes v. U.S. Parole Com'n*, 374 F.3d 1235, 1239 (D.C. Cir. 2004) ("[I]n habeas cases involving present physical confinement, jurisdiction lies only in one district: the district of confinement." (internal quotation marks and citation omitted)). Additionally, "[b]ecause [a] writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in . . . custody, a court may issue the writ only if it has jurisdiction over that person." *Id.* at 1238–39 (second alteration in original) (internal quotation marks and citations omitted). These two principles "[t]ogether . . . compose a simple rule that has been consistently applied in the lower courts[:] . . . Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." *Padilla*, 542 U.S. at 447 (citation omitted); *see also id.* ("By definition, the immediate custodian and the prisoner reside in the same district.").

This Court lacks jurisdiction over any habeas claim that Han intends to make regarding his current detention for the very simple reason that Han is not confined within this Court's territorial jurisdiction. That is, even if one assumes that Han is "in custody" within the meaning of section 2241(c), and that Respondents Lynch and Zukunft are Han's custodians, Han cannot overcome the fact that his current detention is taking place nearly 5,000 miles outside this Court's territorial jurisdiction. *See id.* at 443 (explaining that the jurisdictional limitations on the Great Writ were designed "to

avert the inconvenient [and] potentially embarrassing possibility that every judge anywhere [could] issue the Great Writ on behalf of applicants far distantly removed from the courts whereon they sat" (alterations in original) (internal quotation marks and citations omitted)).  Furthermore, because the record establishes that Han was not transferred between jurisdictions, the Supreme Court's holding in *Ex Parte Endo*, 323 U.S. 283 (1944) is not implicated.  *See id.* at 305−06 (explaining that transfer of a prisoner between districts does not automatically strip jurisdiction from a district court that properly had habeas jurisdiction when the petition was filed).[8]

In sum, any habeas claim Han may have brought in this Court regarding his current detention cannot be entertained, because this Court lacks jurisdiction over Han's petition with respect to his current detention in Hawaii.  *See, e.g.*, *Kahn v. Obama*, No. 08-1101, 2016 WL 6238498, at *3 (D.D.C. Oct. 25, 2016) (granting motion to dismiss habeas petition based on lack of jurisdiction); *Harris v. United States*, 148 F. Supp. 3d 1, 2 (D.D.C. 2015) ("[T]his Court has no jurisdiction over [the habeas] petition, and will dismiss this case[.]"); *Rimi*, 60 F. Supp. 3d at 57, 60 (granting motion to dismiss habeas petition after concluding "[c]ourt lack[ed] subject matter jurisdiction over th[e] moot petition").

## IV.   CONCLUSION

Han's petition is moot with respect to his pre-indictment detention in the District of Columbia pursuant to the Security Agreement, and to the extent that Han seeks relief from his current constructive detention in Hawaii, this Court lacks jurisdiction to afford

---

[8] As this Court concluded above, this case does not involve a single detention period with an intervening transfer; rather, Han experienced a period of pre-indictment detention in the District of Columbia, followed by a second and separate detention once the government filed a criminal indictment in Hawaii.

Han habeas relief.  Accordingly, as set forth in the order accompanying this Memorandum Opinion, the Respondents' Motion to Dismiss Han's habeas petition will be **GRANTED**.

DATE:  December 12, 2016              *Ketanji Brown Jackson*
                                     KETANJI BROWN JACKSON
                                     United States District Judge